Good morning, your honors, counsel. My name is Michael Friedman. I'm appearing on behalf of the appellant Lila Rizk. I would like to address the court on the four issues that were raised on appeal. And I'd like to start off with sort of an overarching theme. It's very difficult to delve into a record this size. I figure it's about six times the length of War and Peace. And it makes it difficult to start pointing to spots in the record to prove that something wasn't proved. It has some colorful characters, too. It certainly does. And your honor, let's face it. This was quite a fraud. This was quite a fraud scheme. And the real question is, is whether the government's net caught a couple of dolphins along with its tunas. It is our position that Ms. Rizk was a tool used by the conspiracy as opposed to a member of the conspiracy. So I want to focus on that concept of conspiracy first and foremost. And I want to draw the court's attention to a case that was cited in the opening brief called U.S. v. Krasovich, a Ninth Circuit case from 1987. And it sets forth the standard for what needs to be proven in a conspiracy case by the government. Let me just ask you one preliminary question. Do we have a dispute here with respect to any of the instructions? No. No appeal was raised on instruction. Okay. So we have a three-week trial and a jury verdict. Yes, your honor. And the main issues for conspiracy and for bank and loan fraud is the substantiality of the evidence and the lack of evidence on a particular issue. That issue, which I raised through U.S. v. Krasovich, is that not only must the government prove knowledge of the illegal objective, it must also prove an agreement with a co-conspirator to pursue that objective as a common one. And that's at 819 Fed Second, 253 at page 255. And the reason that that's important is that we have a conspiracy where Ms. Rizk was lied to by the members of the conspiracy over and over again. They deceived her as to the photographs of the comparable properties that she was supposed to use in her appraisals. They deceived her as to the price of the property. Isn't that her duty? I mean, I think what you're arguing here is she's negligent, not criminally liable. But isn't that her duty to go out and get the comparables and look at the properties? Yes, Your Honor. And frankly, that was an issue that comes with using a South Orange County appraiser to appraise properties in Beverly Hills. But isn't a top-line professional being paid a good fee? Yes, Your Honor. We're not challenging that she exercised poor judgment in relying upon other people to do her work. And probably violated a lot of the appraiser's rules. Go ahead. I'm sorry. And probably she violated many appraiser's rules, many requirements of a professional appraiser. So all that said, you're just saying, well, she's very negligent but not criminally liable. Well, I think it's a misstatement, unfortunately, Your Honor, to say that she violated many rules of appraisals. She violated one, the one that you do your own work yourself. What did the expert testify to? Is she an MAI? She is not an MAI appraisal. She's a CREA appraisal, California Certified Real Estate Appraiser, which is a license given by the state of California. And she did face discipline as a result of this matter. That said, the question isn't whether or not she is bad for having let other people do a portion of the work for her. The question was whether or not she was a participant in a criminal conspiracy, a gross criminal conspiracy. And what we're dealing with is essentially a situation where people go out, they acquire a piece of property in the neighborhood of about a million dollars. They create a false contract for about two and a half million dollars in order to obtain a loan for about a million and a half. They use that million and a half dollars to pay off the purchase, and they pocket about a half million dollars per property. There was no evidence offered at trial that Ms. Rizek knew that there was a first leg of the transaction, the acquisition by the principals, and the creation of a phony contract. The only evidence that the government could cite to that Ms. Rizek knew that the principals, Mr. Fitzgerald and Mr. Abrams, were the ones actually purchasing all these properties, was one reference to a property that was purchased in the name of Mr. Abrams' father, which was 805 Alta, which was one of the very, very first transactions involved in this conspiracy. I'll give the government one more, and that is that Kyle Grasso, a co-defendant, was also a buyer. And excuse me, not a buyer, a borrower on a loan. Well, where the names were familiar, we're not saying that Ms. Rizek didn't recognize Abrams as a name that might be related to Mark Abrams, or that Kyle Grasso was the same Kyle Grasso that she was dealing with, that was with Mr. Babijan, his associate. What we're talking about is all of these properties where there were straw buyers, not even straw buyers, sometimes just absolute fictitious names. And what happened really is, as an appraiser, Ms. Rizek is presented with a contract where purportedly two individuals that she has no knowledge of are willing to offer approximately $2.5 million on a piece of property to support a loan of $1.5 million. And she is called upon to ask whether or not the property will adequately support a loan for $1.5 million. And she does so in a market where prices are skyrocketing and where what was a good comp two weeks ago is now way more than what the comp was in terms of its value, and that properties with lower values have caught up with the purchase price. Because in an increasing market, lower comps become higher as time passes. In a decreasing market, higher comps aren't worth what they were when they were sold. Counsel, Judge Gould, I don't mean to interrupt you, but this sounds like a jury argument, really. And isn't the question for us whether a rational jury could find each element beyond a reasonable doubt? So if there's no – I know you're trying to help us, to want us to read six weeks of testimony, but isn't that the standard under Jackson? No doubt, Your Honor. The point isn't so much that – I'm not saying that the jury couldn't find substantial evidence as to most of the issues. I'm saying that the jury could not make a rational finding of guilt based upon her knowledge of the objective of the conspiracy and an agreement with a co-conspirator to further that objective. That is what's missing. I'm pinpointing one particular element. How many properties were involved here? Well, there was a total of 96 properties, of which about 87 properties were the Lehman Brothers properties, of which about 28 properties were alleged in the indictment, of which 9 properties were specifically alleged in the indictment, of which one property was purported to have a fraudulent appraisal. And that goes to the issue of the summary evidence to which the appellant objected at trial and which we believe was prejudicial and should not have been admitted as evidence. As a demonstrative aid to be used in trial, that's one thing. To be admitted in evidence is another thing. And there, 96 properties where only one property is actually alleged in the indictment to be supported by a fraudulent appraisal. That's just really extreme. I mean, come on. 96 properties, and yet there's really only one claim of a fraudulent appraisal. And in each of those, what they tried to do was draw an association between the second purchase price, the higher purchase price, and the fact that, lo and behold, the appraisal matched it dollar for dollar. Well, the issue for an appraiser is, does the contract that they're presented with, is that an adequate number for the lender to have adequate support for its loan? The appraiser doesn't come back and say, 2.5 million, this property's worth 3 million, because why? The seller would back out. All you ask is whether or not the contract price can be supported, and that's the appraisal number that comes in. So there was never any expert testimony from Mr. Buss that somehow the match between the amount of the appraisals and the amount of the fraudulent contracts creates an inference of fraud or participation in the fraud. The government juxtaposed those two numbers time and again to try to create an impression in lay jurors that that must be the case. It can't be a coincidence that they match, but this was technical stuff. And all it takes is an expert witness, which the government provided an NAI appraiser, to say it's pretty fishy that each of these appraisals matched the fraudulent contract. That was never in the record. And that absence is really important because that was the most damning factor, was that they kept saying that her appraisals matched the fraudulent contract price, hence she had to be involved in the fraud. And that's just not the way, the evidence does not support that inference, and therefore the jury relying strictly upon the evidence could not make that a reasonable inference in order to support guilt on the conspiracy charges and the loan fraud and the bank fraud charges. Also, it goes to show the prejudice of admitting the summary evidence of the 96 properties of which only one was alleged to have had a fraudulent appraisal. Well, I'm having trouble, I can understand how it might be harmful to put this up, but the rules of evidence permit damaging evidence to be admitted. I mean, just because it's prejudicial doesn't, it may be quite probative. So I guess I'm not quite understanding what the legal error is. The legal error, I'm sorry. Yeah, because the rules provide for summary demonstrative material. Yes, but typically it is for purposes of an aid to help the jury to understand evidence that comes in that supports that demonstrative aid. I fear that a 6,000-page record would barely cover the first 15 properties if each transaction was addressed as if it were a separate trial, like the last case we had where we were dealing with maybe one property. Here, when we were dealing with 96 properties, there was not evidence in each of those of the 96 appraisals and how the 96 appraisals were each based upon five points. They were all admissible, weren't they, the underlying appraisals? Yes, they were admissible, but the proof of fraud. Were they available to the, you had them, the prosecution had them. Yes, but of course the burden is on the prosecution to show that those documents were false. That was not done in each and every instance. You handle the case at trial? I wish I had. Okay, so I'm just wondering, I haven't read the record, so if I read the record in closing argument, aren't I going to hear some of the same arguments to the jury that you're making today about how she's not culpable? I wish that were the case, and I may be here one of these days on a 2255, Your Honor, but I don't believe that you will find this stuff. What I do believe is that there was an adequate objection to the admission of the summary evidence. According to the government, it was not an adequate objection, and that the specific objection I'm raising was not specifically raised. Counsel, when you're done, I have a question about the evidence. Okay. Very briefly then, the code section was not cited by trial counsel, but the gist or the underlying rule was cited as a basis for the objection so that it was preserved below. And I'll go ahead and listen to you, Your Honor. Well, here's what I'm concerned about, because I don't know if the issue is being modified by accident, but as I understood it, the document that gave summary proof was not demonstrative evidence. It was under a federal rule of evidence that permits summary proof so long as the documents that make up the underlying transactions are available to the defendant. And the government, I thought, made all that stuff available, though they didn't put it in evidence at trial. But if they'd made it available, why isn't the summary admissible, or at least within discretion? Your Honor, I believe that the summary, if it were limited in its scope to the matters that were embraced in the trial and didn't go way beyond to uncharged offenses, if you will, that that would be appropriate. However, there's two factors going on. One is all of the claimed or contended uncharged bad acts, which essentially make this more in the nature of propensity evidence. And then the second thing is that the juxtaposition of the false contract price, and then right next to it, RISC's appraisal, and then on the ones where RISC didn't even sign it, they had a category of RISC-produced documents on that appraisal. And it was clearly done more in that it was more than just a summary. It was essentially the placing of important points together to create a contention, to create an argument. And the fact that it goes to all 96 of these properties, of which only one was claimed to be based on a fraudulent appraisal, only 28 of which are actually referred to at all in the indictment, it really does go beyond what would be allowable under the federal standards to become really prejudicial. Which number of federal rule of evidence is it, 1006? I was basing this, Your Honor, on federal rules 403, but also 404B. What was it admitted under, though? What was the rule under which the summary was admitted? Your Honor, I don't have the number, but you're correct that it was the one under summary evidence. 106? Yes. There's no dispute about that. What's your best case that says that a court abuses its discretion admitting a document like that when it contains summaries of uncharged crimes? Or put another way, you're arguing that the chart summarized evidence not otherwise presented to the jury, even though it was available to the defense, therefore there's something wrong with the rule. Your Honor, I guess I'm going to argue or assert that my best case is the Huddleston v. United States case, 485 U.S. 681 at pages 688. It's a 1988 Supreme Court case. And it talks about whether it really essentially goes to the issue of whether or not uncharged or evidence of uncharged acts creates an undue prejudice. Your Honor, I have a little trouble with what is an uncharged act here since we're talking about a conspiracy. The 96 properties aren't in the indictment, so I don't exactly understand how you can assert that the 96 properties are all charged acts when the indictment doesn't go beyond 28. Wasn't this made in the closing argument? That the charge lead the jury to believe that she participated in all 96 transactions while the other trial evidence showed her participation only a fraction. Wasn't that argued to the jury? So even from the defense point of view, it was clear that they weren't trying to say she was involved in all 96. Well, actually, they were trying to say she was involved in all 96, and that's why they showed that Rizek had produced documents with respect to the appraisals that she didn't even sign that had different names on them. All right. You've used your time. We'll give you a minute for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Jeremy Matz. I represent the United States. To begin briefly with a case overview of what this case was about and what the evidence proved at trial, I believe, as the Court is aware from reviewing the record, this case was about a huge mortgage fraud committed by about 10 or 11 co-conspirators throughout California from the years 2000 to 2003 in which over 90 homes were bought, but their sales prices were fraudulently and artificially doubled or tripled in terms of the prices that were reported to the lenders. The bottom line here is he's saying that the use of Federal Rule 1006 and the summaries prejudice his client by being propensity evidence, by overwhelming prejudice, and that really it's the use of the summaries that convicted his client. I understand, Your Honor, and let me try to address that point directly. With regard to the summary charts, the summary charts did not, as Defense Counsel claims, cover or address acts or crimes or transactions that were not included in the indictment. That's simply not the case. The indictment as charged, and this is what the District Court found, specifically encompassed all of the properties that were included on the summary charts. It was the indictment against all of the defendants? Correct, including Ms. Rizek. The indictment in which Ms. Rizek was charged contained several allegations. She was charged along with the co-defendants. Along with three other co-defendants, correct. One of them, which was her co-appraiser in the fraud, pled guilty prior to trial. The other two defendants, which were real estate agents, went to trial with her. The indictment contains several allegations that clearly make it very clear to the defendant, to the judge, and to the jury that this case was about and included far more than just the nine homes on which the substantive counts were based and on which the overt acts were based. For example, at paragraph 66 of the indictment, the indictment alleges that Lehman Brothers Bank, one of the primary victims, bought and funded more than 80 inflated loans, including approximately 27 loans in connection with which Ms. Rizek inflated appraisals. The time period covered by that allegation is from 2000 all the way through March 2003. There's no way you get to March 2003, as alleged in the indictment, unless you include additional homes that were encompassed in the summary charts beyond just the nine homes that were in the overt acts and the substantive counts. It's clear upon reading other allegations in the indictment that the reference to the 27 loans that Ms. Rizek inflated appraisals on is only the approximate amount of the loans on which her name actually appeared as they were submitted to the lender, because as the court is aware from the record, there was extensive proof alleged at trial that this fraud essentially consisted of two phases with regard to the defendant Rizek. The first phase, approximately half of the total of about 90 homes, were homes on which the appraisals were submitted in her name and signed by her to the lender, and there was no evidence of any kind on those approximately 40 homes or so that her name was taken off, that anybody's signature was forged, nothing to that effect. The second phase consisted of about the second half of the homes on which she still did the appraisals. She still generated the appraisals. She still provided the inflated appraisal information to her co-conspirators, but because she was nervous and scared and reluctant to have the appraisals continuing to go to the lenders in her name, her co-conspirators agreed to take her name off the appraisals, put other appraisers' names on those appraisals, in no other way change her appraisals, and then submit them to the lenders. Would you explain to me, your opposing counsel has referred repeatedly to there being only one fraudulent appraisal. Could you explain to me the government's view of what he was referring to? I can certainly produce it, Your Honor. I believe that what the defense counsel is referring to is a specific 1014 count, one of the substantive loan fraud counts under 18 U.S.C. Section 1014, which specifically alleges that the appraisal that Ms. Rizek did on 2055 Stradella Road contained a false statement as to the market value, and specifically that's count 21 of the indictment. And the count does state that the false statement as charged in that appraisal was that the estimated market value of that property was $3,050,000, when in reality, as the trial evidence showed, the home was bought for only $1 million. In other words, she tripled the price. Now, it's correct that that's the only 1014 substantive count that was brought on the basis of one of her fraudulent appraisals. In other words, that's the only 1014 count that alleges that one of her appraisals contained a false statement. However, it was by no means the government's theory or proof at trial that that was the only appraisal that was fraudulent. Very clearly, the government presented overwhelming evidence that all of her appraisals were fraudulent, including the eight other ones that were in the indictment, including many more that the expert appraiser, Ron Buss, testified about the nine properties that were the basis of the substantive counts in the overt acts. Those included, about half of those, I believe four or five, were appraisals not submitted to the lender in Ms. Rizek's name. In other words, they were in the second half of the scheme. But nonetheless, appraisals that she actually did. And the government proved that by way of testimony from cooperating co-conspirators, by way of the fact that she herself produced records, including highly significant material records in response to a government subpoena. And those records were presented at trial on properties that did not go to the lender in her name, but rather went to the lender in other appraisers' names. Nonetheless, she still had in her own files copious documentation about those properties, showing that she did those appraisals at the very times on which the fraud was committed as to those homes. One example is on the Mandible Canyon property. And I would refer the court to the government's excerpts of record at pages 478 to 479. Those are pages that were introduced at trial. They were provided by the defendant in response to a grand jury subpoena before trial. And they contain essentially her work product as to that Mandible Canyon appraisal. Now, that one did go to the lender in her name, so I should make that clear. There's a second property, for example, that did not go to the lender in her name, but which nonetheless she provided copious documentation, same basic situation. That's found at the government's excerpts of record on page 451. That's the Easton Drive property. As the evidence showed at trial, that property, as submitted to the lender, the lender thought it was some other appraiser who did the appraisal, not Ms. Rizzo. Nonetheless, she actually did it, and that was proved by the fact that she provided sketches, rough appraisal work, notes, all that sort of thing on that particular property. Did you try the case? I did, Your Honor, along with a co-counsel. Mr. Matz, I've got a question for you, Judge Kuhl. My question is, are there cases that we have in the Ninth Circuit that address whether, if the government charges a conspiracy, it is not an abuse of discretion for a trial court to admit evidence on the full scope of the conspiracy, even if a particular defendant did an overt act that, you know, didn't wrap around the whole conspiracy? I believe Your Honor is referring to the summary chart issue or to the sufficiency of the evidence issue. I'm just trying to understand the question. The summary chart. I'm thinking about the summary chart. Yes, Your Honor. I am not presently aware of a particular case in the Ninth Circuit that may address that, although I do believe that's a correct statement of the law. We cited a few cases in our brief, including from the Eighth Circuit and from the Sixth Circuit, that essentially address this issue more precisely on the 403 argument that defense has raised, in other words, whether the admission of the charge was more prejudicial than probative. And in those cases, specifically U.S. versus Bozeman from the Eighth Circuit and United States versus Bray from the Sixth Circuit, the charts were admitted and the courts upheld the admission of those charts, where they summarized essentially total facts concerning the entire course of the fraudulent schemes in those cases. I would pick up on that point, Your Honors, and mention that it's very important to remember that Ms. Rizek was not only charged with discreet, false statement counts, i.e., 1014 substantive loan fraud counts. She was charged with many of those, of course, under Pinkerton theory and also under direct liability as in the case of the Stradella Road appraisal. But in addition to those counts, she was also charged with conspiracy to commit bank fraud and loan fraud, and she was charged with substantive bank fraud. And both of those counts, as specifically alleged in the indictment, were fairly far-reaching scheme-oriented counts, not counts focused on any one particular property necessarily, but overarching scheme-focused counts covering the entire factual course of the scheme. She was tried with the co-defendants? She was tried with two of them, yes, Your Honor. Two of the co-defendants, the brother pleaded guilty. Okay. And were there any motions for severance or anything like that? There were no motions for severance brought by any of the defendants. And there was the government motion, of course, to admit the summary charts. That was opposed by all defendants, and that was granted by the district court. What happened to the mortgage broker? Was he charged?  The mortgage broker. Yes, Your Honor. And the developer, who were sort of the masterminds? Yes. They were both charged, and they both pled guilty. The mortgage broker was Mark Abrams. He pled guilty about a few years, I think, before Misrisic went to trial, to essentially everything, cooperated, testified at trial, and received an approximate six-and-a-half-year sentence, I believe. The other mastermind was Charles Elliot Fitzgerald. He was the developer that the court referenced. He fled the country at first, eventually was brought back to the U.S., charged and pled guilty, and received a 14-year sentence. Yes, Your Honor. And she received what, 36 months? A three-year sentence. Okay. And so the chart related to all of the transactions, and she was able to argue in closing argument that not all of them related to her, I take it. Very much so, Your Honor, and I believe she did. I would have to check the transcript on the closing argument just to be sure, but in response to Your Honor's question, you will absolutely see in defense counsel's closing argument in this case, representing Misrisic, many of the very same themes that defense counsel has addressed her on the appeal, most overarching of which is that she was, as he put it, a tool and a pawn and a dupe of her co-conspirators. Unwitting appraiser who did a bad job and didn't know what was going on. Absolutely, and was taken advantage of by her co-conspirators. That was the overarching theme of the defense, not only as to Misrisic, I should point out, but also as to the other two defendants, the real estate agents who went to trial. Everybody here who went to trial went to trial on the theory that Abrams and Fitzgerald had duped them just like they duped the lenders, and the jury in its discretion rejected those defense arguments. Would you address the argument that she was ordered to pay restitution and the lenders had released all their claims against her, there was another settlement, so she shouldn't have had to pay the restitution? Yes, Your Honor, I would be happy to. The statutory framework on that issue is very clear under the Mandatory Victim Restitution Act, and that is that the district court had to order restitution in the full amount of the victim's losses without regard to any defendant's economic circumstances. The statutes also, of course, as we've cited, go on to state that if a victim recovers from an insurance company, perhaps even prior to the defendant's sentencing, the court cannot consider that recovery in setting the amount of restitution in the first instance. If the victim does recover from insurance, as we've noted, the district court could order the defendant to pay back the insurance company as essentially part of her restitution order, but only after the defendant has paid still what's owed to the victim. But if the victim, I guess the wrinkle here is the release, does that make any difference? That does not make any difference, Your Honor, and I can try to explain why. The reason it does not make any difference is because contrary to the defense arguments in the reply brief, the criminal restitution order that Judge Pregerson entered against Ms. Rizek did not nullify or render meaningless in any way the settlement that she had previously reached with the victims and with the insurance company. It simply did not do so. That settlement was simply a settlement for a particular dollar amount, a release of claims in exchange for the payment of that dollar amount, and very clearly no admission of wrongdoing or liability by anybody, by Ms. Rizek or by the victim banks. In other words, it was a standard civil settlement. I agree to pay you money. You agree not to drop your lawsuit against me and not sue me anymore in the future, and in exchange we all just walk away and nobody admits that they did anything wrong. That's all the settlement stated, and that's all the settlement encompassed. The settlement did not bar the victims from receiving, essentially passively receiving in the future, any money that a judge might order in criminal restitution against Ms. Rizek. In fact, the settlement specifically stated, and I can refer the court to the defendant's request for judicial notice in which he included the settlement, that settlement agreement specifically stated that the victims had an ongoing obligation, the victims here being Lehman Brothers Bank and RBC Mortgage, that they had an ongoing obligation to cooperate with the government and regulatory authorities in any investigations that might still unfold, including, of course, the criminal prosecution. Nothing about that settlement absolved Ms. Rizek from having to pay criminal restitution in the future if it were ordered. Nothing about the settlement prevented the victims from accepting any such money in the future if it were ordered. These are essentially two shifts passing in the night, Your Honors, that did not have anything to do with each other and did not cancel each other out, that being the civil settlement with the insurance company and the criminal case. Do we have a Ninth Circuit case, Mr. Madsk, do we have a Ninth Circuit opinion that says that the civil release does not restrict criminal restitution under the MVRA? I don't know if there is such a case under the MVRA, Your Honor, but I do believe that there is a case under the VWPA, the previous restitution statute that governed restitution law before 1996. Of course, that statute is not applicable to Ms. Rizek. But under the VWPA, Victim Witness Protection Act, the Ninth Circuit decided a case called Cloud, which is cited, I believe, by the out-of-circuit case that the defense cites in their opening brief. And that case, Cloud, was a Ninth Circuit case, as I recall. And in that case, the holding was that the district court still could order restitution under the VWPA to be paid to an insurance company, even where prior to the time of the criminal sentencing, the insurance company, the victim, and the defendant had entered into a settlement agreement and a mutual release, very similar to what happened here. And I think clearly by analogy, if that was permissible under the VWPA, it would certainly be also permissible under the MVRA, the present statute. Here below, we had no argument that there should be any apportionment of the $46.5 million. And, in fact, there wasn't even an argument about the restitution order, was there? There was not, Your Honor, and that's why it should be reviewed for plain error. Your Honor is correct on both counts. Unless the court has further questions, I would submit. I have no questions. Judge Schroeder, could we get the appellant a couple of minutes extra to address restitution?  Thank you, Your Honor. Thank you. Thank you, Your Honor. Before I go to restitution, which is really what I want my rebuttal to focus on primarily, I just want to point out one thing that really stuck in my craw. Just ten minutes ago, the government stands here and says that Ms. Rizek submitted appraisals and that she got nervous and she got scared. And so the conspirators changed the appraisals and put other names on them. That couldn't be any more false. And I specifically quoted the language from the transcript in the opening brief on this issue. Jameson Matakowski, who was the assistant of Mr. Abrams, the mortgage broker, he testified. Question, did you participate in the preparation of this appraisal report? Answer, yes, sir. Question, did you yourself type in the name Fred Williams? Answer, yes. Question, why? Answer, Rich Mays at one point said that the loan packages that were being submitted to Aurora were too consistent, the same appraisers every time. He suggested that we find two new appraisers. Mark Abrams asked me to look up on the Office of Real Estate Appraisers website and identify a couple names that we could retype the appraisals that we received from Lila into two different names. Question, this started from a phone call or information you got from Mr. Mays? Answer, correct. I couldn't let a mistake like that not get corrected. There's a lot of facts in this, and I'm not going to attribute wrongdoing. But the evidence is what's in the transcripts, not the arguments of counsel. I'll leave it at that. If I can go on to the restitution issue. Plain error, yes. Would it have been nice to see that argument raised in response to the pre-sentence report? Yes. Did the sentencing memoranda focus on prison sentence rather than restitution? Yes. Shouldn't have. Plain error. When you say plain error, counsel, are you saying that it's plain error to give any restitution because of the release, or are you saying the amount is plain error? Unfortunately, I'm saying it's the standard group review. I wish I could say that it was plain error not to impose a restitution order at all. I can't honestly say that I have the knowledge of what was the intention of Judge Pragerson when he issued that order. All I know is that we have two orders from the same judge involving the same perpetrator and the same victims, and they are entirely inconsistent with one another. And if that doesn't meet the plain error standard of review for having this court intervene and either, one, find out what the heck Judge Pragerson intended and then rule upon his decision once there's some finding made with respect to what was the intention, or two, saying you just can't have two inconsistent orders regarding $46.5 million because we have banks and receivers of banks who all need to rely on a clear understanding of what goes here, restitution order or settlement order. These banks need to know what they can do. My client needs to know what she can do. Is a civil settlement, can it restrict the MVRA? As the government stated, there is no case to our collective knowledge that deals with this particular statute, and you have to go back to the former statute. And he cited U.S. v. Cloud, which was cited in a case that I referred to, which was United States v. Coleman. It's a Fifth Circuit case from 1993. In Cloud, the settlement was not allowed to bar restitution, but not as a matter of law, but on the particular facts of that case. And in Coleman, they said, yes, we acknowledge the ruling of U.S. v. Cloud. However, its facts are in a posit in this case. And in U.S. v. Coleman, the court concluded that they could not affirm a restitution order that contradicts a carefully negotiated settlement agreement. So we have, at best, two conflicting orders on a very large sum of money. It does need to be resolved. The government appears to have tried to provide some type of resolution. However, it does not appear. Just so I understand, the conflicting orders are what exactly? Lila Rizic shall pay to Lehman Brothers Bank, Royal Bank of Canada, and the trustee of a various number of lenders the sum of $46.5 million and a order approving a settlement whereby Ms. Rizic paid those same people $950,000 and that those victims are forever barred and enjoined from trying to collect $46.5 million and release Ms. Rizic from the obligation to pay that sum to them. Okay. You're not referring to any inconsistency among the defendants or anything like that? No. It's a settlement. Yeah. Okay. Interestingly, at a minimum, that $950,000, excuse the expression, isn't chicken scratch. And there was no credit in the order for the $46.5 million that that sum had been paid. It appears it was a clear oversight. Thank you. I'll submit. Thank you very much, Your Honor. Thank you. We've been generous with the time. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: McCuskey, Schroeder, Gould